IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

TRANSCRIPT OF PROCEEDINGS

----------------------------x
                            :
UNITED STATES OF AMERICA,   :        CRIMINAL ACTION
                            :        NO. 5:14-CR-00244
vs.                         :
                            :
DONALD L. BLANKENSHIP,      :        December 17, 2014
                            :
        Defendant.          :
                            :
----------------------------x

MOTIONS HEARING

**BEFORE THE HONORABLE IRENE C. BERGER**
**UNITED STATES DISTRICT JUDGE**

APPEARANCES:

For the United States:      **MR. STEVEN R. RUBY**
                            Assistant U.S. Attorney
                            300 Virginia Street, East
                            Charleston, WV  25301

For the Defendant:          **MR. BLAIR GERARD BROWN**
                            **MR. WILLIAM W. TAYLOR, III**
                            **MR. STEVEN N. HERMAN**
                            Zuckerman Spaeder
                            Suite 1000
                            1880 M Street, NW
                            Washington, DC  20036

                            **MR. JOHN H. TINNEY, JR.**
                            The Tinney Law Firm
                            P.O. Box 3752
                            Charleston, WV  25337-3752

APPEARANCES (Continued):


For the News Media Intervenors:


**MR. SEAN P. MCGINLEY**
DiTrapano, Barrett, DiPiero,
McGinley & Simmons, PLLC
604 Virginia Street, East
Charleston, WV  25301


Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography; transcript
produced by computer.

P R O C E E D I N G S

1

2       THE CLERK:  The matter before the Court is the

3  *United States* vs. *Donald Blankenship*, Criminal Number

4  5:14-CR-244, scheduled for motions hearing.

5       THE COURT:  Good morning, everyone.

6    Counsel, would you note your appearance for the record,

7  please.

8       MR. RUBY:  Good morning, Your Honor.  Steve Ruby

9  for the United States.

10      MR. MCGINLEY:  Good morning, Your Honor.  I'm here

11  on behalf of News Media Intervenors, *The Wall Street*

12  *Journal*, *The Charleston Gazette*, *West Virginia Public*

13  *Broadcasting*, *National Public Radio*, and *The Associated*

14  *Press*.

15      MR. TAYLOR:  William Taylor on behalf of Mr.

16  Blankenship.

17      MR. BROWN:  Good morning, Your Honor.  Blair Brown

18  on behalf of Mr. Blankenship.

19      MR. HERMAN:  Your Honor, Steve Herman on behalf of

20  Mr. Blankenship.

21      MR. TINNEY:  Good morning, Your Honor.  Jack

22  Tinney on behalf of Mr. Blankenship.

23      THE COURT:  Good morning.

24    All right, counsel, and particularly Mr. McGinley, I

25  want to address your motion first.

 1          Let me place on the record that I've reviewed your

 2     written submissions, and I want to give you an opportunity

 3     to place any argument on the record that you want.  But

 4     preliminarily I want to address the issue of intervention.

 5          In looking at that issue, I will candidly say to you

 6     that I did not find any cases within the Fourth Circuit or

 7     any procedural rule that would permit intervention in a

 8     criminal matter, but I did see cases to that effect in other

 9     circuits.

10          And because I believe that your clients have standing

11     certainly to complain about the issue, I want to be able to

12     get to the merits.  And, so, given that case law that I saw

13     outside of the Fourth Circuit of intervention in criminal

14     matters, I am going to grant the motion to intervene for the

15     limited purpose of addressing the issue of the order which

16     was entered on November the 14th of this year.

17          So, with that preliminary issue taken care of, Mr.

18     McGinley, I'm happy to hear your argument relative to the

19     First Amendment issues you've raised with respect to the

20     November 14th order.

21          MR. MCGINLEY:  Thank you, Your Honor.

22          And I'll just say in regard to standing, I did that

23     research as well.  You know, the, the rules just don't

24     address this particular situation.  I don't think they

25     address it one way or the other.  But the case law, I think,

 1    is, is pretty clear that it's, it's a matter of

 2    constitutional standing under the First Amendment when the

 3    press, the press has a right to challenge these types of

 4    orders.  And traditionally it's been done through the mode

 5    of intervention even in criminal cases.

 6         So, I -- that's, that's where I was coming from.  I

 7    didn't find any Fourth Circuit precedent as well, but I

 8    didn't find any contrary precedent anywhere.

 9              THE COURT:  Don't get me wrong.  I do not believe

10    there is any issue with respect to standing.  I was looking

11    for the procedural vehicle to use to assert that standing.

12         But, again, even though I found nothing in this circuit

13    in terms of precedent for allowing intervention in a

14    criminal matter, I did find it outside of this circuit.  And

15    I am going to grant the motion to intervene for that limited

16    purpose because I think the issues are important to be

17    addressed.  And there is no doubt about the issue of

18    standing in my opinion.

19              MR. MCGINLEY:  Thank you, Your Honor.  I

20    appreciate that.

21         Let me get started first by saying that -- just to give

22    a little background on, on why we're here.  My clients are

23    press organizations.  And, as such, they have First

24    Amendment rights of news gathering which is a protected

25    right pursuant to the First Amendment.

1       I think the case law also is clear that that First

2   Amendment right of news gathering applies to not just civil

3   cases, but criminal trials as well.  A major purpose of the

4   First Amendment is to protect the free discussion of

5   government affairs.  The Constitution protects the press's

6   right to receive information and ideas from willing

7   speakers.  So, that is why we're here.

8       There's two parts to the Court's order that my clients

9   are challenging.  One is the gag order on trial

10   participants, court personnel, victims, victims' families,

11   the, the breadth of the order.  And it impacts on the

12   press's ability to receive information from willing

13   speakers.

14       The gag order obviously is a prior restraint on speech.

15   And, therefore, it's subject to strict constitutional

16   scrutiny.  The fact that the order extends to restrain

17   speech beyond trial participants to actual and alleged

18   victims and their families in, in our view shows that the

19   gag order is overbroad on its face.

20       The, the speech of persons who aren't trial

21   participants can only be restrained, the case law says, when

22   it's absolutely necessary to preserve a fundamental right.

23   And that happens in very, very rare circumstances.  And the

24   standard of being absolutely necessary, obviously, is about

25   the highest standard that can be applied.

1    Speech can be restrained by a court only if there's a

2    showing that the specific speech being restrained poses a

3    certain direct and imminent threat to a fair trial right or

4    other constitutional interest.  That's, that's from the case

5    law.

6    The Court's order which was entered the day after the

7    indictment refers only to the fact that there had been

8    pre-trial publicity.  So, certainly in the order -- and this

9    is not to suggest that what the Court was attempting to do

10   in, in creating a fair and impartial jury is something the

11   Court should not be concerned with.  But the, the reasons

12   for the -- stated in the order for imposing the gag order of

13   just pre-trial publicity is not in and of itself enough to

14   impose a gag order.

15   The -- in order to impose a gag order, there has to be

16   a showing of a certain direct and imminent threat to a fair

17   trial or other constitutional interests.  And that's the *CBS*

18   vs. *Young* case.

19   Imposition of a gag order requires a showing and

20   findings by the Court that there also are no adequate

21   measures, alternative measures that can mitigate the effects

22   of pre-trial speech.  And the Court's order doesn't address

23   that possibility either.

24   The Court must have a record before it in which

25   findings are made that the restraint of speech will

1    effectively prevent the demonstrated harm.

2         So, on the one hand, there has to be a showing that

3    there is going to be a demonstrated harm by the speech.  But

4    it also has to be shown that the gag order would, in fact,

5    be effective to prevent that particular demonstrated harm.

6         And we don't think that that is the case, certainly not

7    at this stage of this criminal trial that there's a record

8    or a showing or, that exists here in this case.

9         The record also must be supported by findings by the

10   Court that without a restriction on the extrajudicial speech

11   that there's a reasonable likelihood of prejudicing a fair

12   trial.  The reasonable likelihood standard is a very high

13   standard.  And it's -- the case law shows that it's only met

14   in very unusual circumstances, unusual cases.

15        Restrictions on speech have to be -- additionally have

16   to be narrowly tailored to prohibit only those statements

17   that are likely to threaten the right of a fair trial or of

18   an impartial jury.

19        Here the Court's order is -- as applied is very broad

20   and applies to any discussion about the facts or

21   circumstances of the case and isn't narrowly tailored to

22   address whatever prejudicial speech might be out there.

23        The same type of standards apply to a, to an order

24   sealing the court file, although I think that the cases also

25   show that I think the standard is actually higher for

1  sealing court records, you know, especially an umbrella

2  order as here where every filing is being, being sealed.

3  The record has to support a finding that without the

4  restriction, there would be substantial probability that a

5  compelling interest would be prejudiced.

6      In criminal cases the case law says there is a

7  presumption in favor of openness.  And this right of public

8  access again springs from the First Amendment.  The

9  presumption of openness can be overcome only on the basis of

10  specific judicial findings -- and this is the *Charlotte*

11  *Observer* case -- that there is a substantial probability

12  that the defendant's right to a fair trial will be

13  prejudiced by publicity; also, that there is a substantial

14  probability that the closure would prevent the prejudice;

15  and, three, that reasonable alternatives to closure can't

16  adequately protect a defendant's fair trial rights.

17      So, again, the, the standards that are applied to

18  determine whether a gag order should be imposed are similar

19  to those in regards to sealing court records, although I

20  think with court records, you know, it's, it's somewhat

21  different because the Court then has an ability and

22  responsibility to review each particular filing to determine

23  whether or not it would be something that could, if revealed

24  to the public or to the press and reported on, would

25  prejudice the defendant's rights to a fair trial.

1          Again, like the gag order, denial of access to records

2     must be narrowly tailored to serve a compelling government

3     interest.  And that's the *Shelton* vs. *Tucker* case, and also

4     *Doe* vs. *Public Citizen*.

5          The presumption of public access can be rebutted only

6     by a showing in the record that countervailing interests

7     heavily outweigh the public interest in access.  There has

8     to be a showing that there's -- any restriction on access

9     will be effective to prevent the threatened interest for

10    which the limitation is imposed.

11         Again, these are the same -- in regards to the sealing

12    of court records, it's the same type of standard that's

13    applied to the gag order.  The consideration of all those

14    concerns have to be on the record, must occur on a

15    case-by-case examination of all the competing interests at

16    stake.

17         Again, this is not to say that what the Court was

18    attempting to do in its order is not something that's proper

19    for the Court to be concerned with.  Obviously, the

20    defendant's Sixth Amendment and rights to fair trial are

21    important and the Court needs to consider those things.

22         But the U.S. Supreme Court in the *Nebraska Press*

23    *Association* case -- and I'll quote -- "Pre-trial publicity,

24    even pervasive adverse publicity, does not inevitably lead

25    to an unfair trial."

1       So, the simple fact that there has been a great deal of

2    publicity surrounding the Upper Big Branch tragedy and there

3    was publicity when the Government filed the indictment

4    doesn't lead inevitably to an infringement on the, on a

5    defendant's right to a fair trial.  And that is the basis

6    that is on the record that's cited in the Court's order for

7    the sealing and gag order.

8       The Fourth Circuit has held that even where there is

9    persuasive substantial inflammatory publicity surrounding a

10    trial, a closure order still might be impermissible.  I've

11    cited in my brief the *Skilling* case which is a recent case

12    where the U.S. Supreme Court held that juror exposure to

13    news accounts of prominent crime does not presumptively

14    deprive a defendant of due process or prejudice, or the

15    partiality in a jury pool.

16       I've cited also the *CBS* vs. *Young* case which is the

17    case that arose out of the Kent State shootings where a

18    similar gag order was entered in that case, albeit it was a

19    civil case.  But the, the Court, the Court of Appeals found

20    that that was a -- one of the broadest types of gag orders

21    that, that could be imposed and reversed it and did not

22    impose a gag order in that case.

23       And, again, in the Fourth Circuit there is the, the *In*

24    *Re: State Record* case which discusses the Court's obligation

25    to review the documents.  When there's no showing that a

1  particular document will prejudice the proceedings, the

2  sealing order is overbroad.

3      And, you know, I understand again what the Court was

4  attempting to do.  But in this case, for example, there are

5  notices of visiting attorneys, those types of things.  So, I

6  think presumptively the Court's order sealing everything in

7  the file, I don't -- you know, those types of things

8  wouldn't prejudice a trial.  It's, it's presumptively

9  overbroad because it applies to everything and doesn't do a

10  particularized examination.

11      Again, it has to be effective to prevent the harm that

12  is being directed at the -- by the gag order and the sealing

13  order.  Here I think that the harm that the Court is

14  directed at in attempting to ensure that the juror pool is

15  free from bias is, is an appropriate concern of the Court,

16  but here we also -- the fact -- pragmatically the fact is

17  that this is the subject of news reports over four and a

18  half years, four extensive government investigations,

19  countless media reports already.

20      So that the closure of the court file and the gag order

21  can't go back and put all that back in the bag.  I mean, the

22  information is already out there and already exists.  If

23  that's -- if that is actual, actually an issue, the, these

24  things won't be effective to change any of the things that

25  have already happened and the publicity surrounding these

1    events that occurred prior to the indictment.

2         The, the case law also requires that before a gag or

3    sealing order can be imposed, the Court also must consider

4    what, whether alternative measures that are less restrictive

5    would be effective before infringing on the press's First

6    Amendment rights to gather news.

7         The Court must consider things such as more careful

8    measures in jury selection, more intense *voir dire* in order

9    to avoid prejudicial effects of adverse publicity.  And,

10   again, that's the *Nebraska Press* case from the U.S. Supreme

11   Court.

12        Other alternatives that the Court could use in this

13   case include, you know, the instructions to the jury about

14   what they are listening to, sequestration of a jury, use of

15   a larger jury panel, and even a change of venue.

16        Again, the, the order isn't narrowly -- it is very

17   broad.  It's not narrowly tailored.  It applies to all

18   statements, not just those that might prejudice the

19   defendant's right to a fair trial.

20        It applies to all filings, regardless of content,

21   regardless of whether the filing would, in fact, prejudice

22   the defendant's right to a fair trial.

23        And, lastly, I think the Court needs to consider the

24   public interest.  And while the defendant's right to a fair

25   trial certainly is something that is a, a significant

1   interest, so is the First Amendment right of the press and

2   also the public interest in receiving information about this

3   case.  Keeping the public accurately informed about the case

4   is in the public interest.

5        I've cited in the brief a quote from Justice Powell in

6   the *Nebraska Press Association* case that press reports

7   contribute to the public's understanding of the rule of law

8   and to the comprehension of the functioning of the entire

9   judicial system.  Again, that's why lifting the gag order

10  and the sealing order would be in the public interest.

11       The -- as the order now stands, it creates a barrier to

12  the public's full understanding of the, of the important and

13  newsworthy events in this case.

14       And, lastly, there's a recent case in the U.S., in --

15  I'm sorry -- the Court of Appeals for the Fourth Circuit,

16  the *Doe* vs. *Public Citizen* case that addresses, again, the,

17  that it is sometimes better to have these issues out in the

18  open, increases public access, promotes trustworthiness in

19  the judicial process, provides the public with a complete

20  understanding of the judicial system, and a better

21  perception of fairness.

22       And for all of these reasons, my clients, the press

23  intervenors here, would ask the Court to reconsider the

24  November 14th order and vacate it and lift the restrictions.

25            THE COURT:  All right.  Mr. McGinley, I want to

1   make sure -- I think you have carefully gone through most of

2   the arguments that you presented in your written submission.

3   I want to make sure that I understand your points, and I

4   want to address first the issue of alternatives.

5       You have spoken about alternatives which, in my

6   opinion, may or may not be alternatives for the Court at

7   this point.  And, so, I want to give you an opportunity to

8   address those.

9       When you speak about additional jurors or the *voir dire*

10  process, of course we do that in every case to try to ensure

11  that there is a jury that can sit fairly and impartially for

12  both the Government and the defendant.  But you also speak,

13  as does some of the cases, to the alternatives of

14  sequestration and a change of venue.

15      When we think about sequestration, of course, that's

16  after we've been able to impanel a jury.  So, I have some

17  concerns about whether or not that is really a viable

18  alternative for the Court's consideration at this point.

19      And, secondly, when we think of a change of venue,

20  generally that is something that occurs only after the Court

21  finds that the panel is such that the defendant cannot get a

22  fair and impartial jury.

23      And, so, it appears when we look at that as a so-called

24  alternative, it only comes into play after the damage is

25  done.

1    So, as to whether or not that is a, quote, viable

2    alternative or not, I have some question in my mind as well.

3    And, so, I want you to -- I want to be candid with you in my

4    consideration of those issues as alternatives and give you

5    an opportunity, if you would like, to address those on the

6    record.

7            MR. MCGINLEY:  Sure, Judge.  I think -- and you're

8    right.  Sequestration as just an alternative, I think, is

9    more, more appropriately addressed at the time of trial and

10   whether or not the Court would, a Court would find that the,

11   whatever is going on at the time of trial requires

12   sequestration of jurors.  I mention that only as an example

13   of the types of alternatives that courts consider under,

14   under particular circumstances.

15   Primarily, though, the, the most important alternative

16   is a more exacting *voir dire*.  Again, not to say that courts

17   don't engage in an exacting *voir dire* in every case, but

18   certainly the, the alternative of using a larger juror pool

19   and going beyond what we would ordinarily do in *voir dire*,

20   taking more time, taking more jurors, those are the primary

21   alternatives available to the Court that is a less

22   restrictive means.

23   Insofar as the change of venue is concerned, I, I agree

24   with you that that certainly is something that only occurs

25   after the Court would determine that there is a showing that

1    the jury panel or pool is, is sufficiently biased or there's

2    some other issue that requires the Court to move.  Primarily

3    again, though, although I do think it is an alternative and

4    a less restrictive means than the order that the Court is

5    using at this point.

6        I don't think that -- if you, if you step back to the

7    initial analysis, I don't think we, we get to that at this

8    point because I don't think we have a record or a showing

9    that I can see that, that requires a gag or sealing order at

10   this point in the proceedings.

11       But, primarily, again, it's the *voir dire* I think is

12   the most important and most effective way and the less

13   restrictive alternative that the Court has to ensure that

14   the jury pool and jury panel is not biased.

15           THE COURT:  When we talk about the change of venue

16   as an alternative, you mentioned earlier in your argument

17   about the public's interest in having access to the

18   information.  And it appears when we look at the law that

19   there is somewhat of a preference, and I use that word

20   somewhat loosely, Mr. McGinley, for these trials to take

21   place in the district in which the defendant is indicted.

22       There is a public interest there as well, so that I

23   believe the public who has the most interest in the issues

24   which are the subject of the indictment have the ability to

25   attend a trial, which may not be the case if the Court had

1   to order a change of venue.

2     I think that that is also a public interest that really

3   hasn't been covered so far in either the written submissions

4   or the argument.  That, again, I want to lay on the table

5   for you and tell you that it is something I've given

6   consideration to.  And I want you to be able to respond to

7   that if you choose to do so.

8       MR. MCGINLEY:  Absolutely, Your Honor.  And I

9   don't disagree with anything you say.  The, the -- I, I

10   think the case law absolutely evidences a preference to keep

11   the trial in the district.  Don't get me wrong.  I'm not

12   suggesting that there's any basis at all for a change of

13   venue in this case.

14       THE COURT:  And I didn't mean that you were.  But

15   when the case law -- and when you talk about change of venue

16   as an alternative, I think it's also important to look at

17   what that does to that public interest that you also argued

18   earlier.

19       MR. MCGINLEY:  There's no doubt, Judge.  I think

20   the public interest in keeping this, this case here is very

21   strong.  I think that there is no reason for a change of

22   venue.

23     I agree that's -- it's -- all I was doing is comparing

24   and weighing, and that's ultimately the job of the Court,

25   but to compare and weigh whether there is a less restrictive

 1   means than the gag and sealing order to accomplish the fair

 2   and impartial trial and keep the trial here.  I understand

 3   that's, that's the heavy job that the Court has.

 4        But from, from the, from the situation in this case,

 5   there is no, there is no reason to change the venue, but we

 6   also feel that the public interest in lifting the, the gag

 7   order and the sealing of the court records is also in the

 8   public interest and also heavily outweighs any other

 9   interests in, that could not be done but with a less

10   restrictive mean.

11        And, frankly, I understand all of those things are, are

12   items that the Court must weigh.  But when balancing them

13   all at the end of the day, I think the one that, that is the

14   easiest to resolve is whether or not there should be a gag

15   and sealing order.  And that's what we think, that's what we

16   think should be reconsidered and vacated.

17        And, ultimately, if there is a reason to change venue

18   in this case, again, which I don't think there is, but if

19   there was, it's because of the facts that are already out

20   there in the public domain, the information that has already

21   been published and revealed and disseminated.  It's --

22   that's already out there.  That's why I don't think the gag

23   and sealing order meets the criteria of being effective to

24   accomplish the Court's goal.

25        Again, not to say that there is a basis for a change of

```
 1   venue.  But if there was, it would be based on the pre-trial

 2   publicity, not on what trial participants or counsel or the

 3   record might reveal at this point, at this point in time.

 4          THE COURT:  Well, I agree with you.  And you have

 5   listed in your memorandum in support, I think in a footnote

 6   over the course of a couple of pages, a list of the news

 7   articles that have appeared since the UBB mine disaster.

 8   There has been a lot of publicity.

 9      I take it from your argument that if there were a need

10   for a change of venue, that alternative that has been spoken

11   about, that it would be based on that; that it is your

12   position that with the return of an indictment that has

13   specific charges in it and specific facts that are alleged

14   that the publicity that would be drawn from that between the

15   return of the indictment and the trial, which would be much

16   more specific as it relates to this Court's ability to seat

17   a jury than that which is heard previously, you do not

18   believe that that would have more of a probability of

19   resulting in prejudice than those more what I'm going to

20   call articles which were general, more general prior to the

21   return of the indictment.

22          MR. MCGINLEY:  Judge, it's my position that it

23   would be less.

24          THE COURT:  Okay.

25          MR. MCGINLEY:  I think having, having correct and
```

1    accurate information from those most knowledgeable about the

2    case, the trial participants, victims, their families,

3    rather than secondary sources, and also the, the reporting

4    on what is actually occurring in the court, what's being

5    filed, what's being argued, I think that decreases the

6    chance of a, of a partial jury.  I think it actually

7    enhances the ability of the Court to have an unbiased jury

8    panel --

9              THE COURT:  All right.

10             MR. MCGINLEY:  -- because the jurors -- one of the

11   things I didn't speak about but I think we all understand

12   that the Court -- the Sixth Amendment right doesn't mean

13   that a defendant is entitled to have a jury of people who

14   have been shut in and had their hands over their ears.

15       Jurors come to this court -- potential jurors come to

16   this court having read newspapers, knowing something about

17   the case.  But it's -- the question is, knowing that and

18   being instructed by the Court, can they be fair and

19   impartial.

20       And, and in my experience, it's almost always possible

21   for the Court to, using *voir dire* to, and asking jurors

22   questions if they've read something, will that, will that

23   bias them, will they take in the evidence fairly and not

24   make a decision until the end of the trial, those types

25   of -- and those types of questions can be expounded on if

1   there are additional concerns based on press reports about

2   the pre-trial proceedings.

3       But I don't think it would rise to the level or there's

4   any showing that it's necessary at this point.  And, in

5   fact, I think that having jurors who understand these issues

6   and keep open minds is probably to the benefit of all

7   parties in the case and the public interest.

8           THE COURT:  Thank you, Mr. McGinley.

9       Counsel, is there any comments that either of you want

10  to make on this particular issue or position that you want

11  to take?

12      Mr. Ruby, I'll hear you on that.

13          MR. RUBY:  Thank you, Your Honor.

14      I hope it goes without saying, Your Honor, that the

15  United States shares the Court's concern about the

16  importance of seating a jury in this district.  And I'm

17  confident that we're going to be able to do that.

18      The defendant hasn't, of course, filed a motion yet to

19  change venue, but he's hinted and maybe even set outright in

20  some of his filings, the filings that he has made that such

21  a motion is coming.  There's no motion yet to argue on that

22  point, but I do want to, to tell the Court that we disagree

23  strongly with the defendant's claim in his response to the

24  news media motion that it will be impossible to seat an

25  impartial jury here.

1    It's hard for me to imagine that out of all the

2    eligible jurors in this district, which I don't know the

3    number, Your Honor, but there are tens of thousands,

4    hundreds of thousands probably of eligible jurors in this

5    district that we can't find 12 who are able to consider the

6    evidence in this case impartially.

7         THE COURT:  So, is that a position -- all I want

8    to know is if there is a position on this motion of Mr.

9    McGinley's.

10        MR. RUBY:  I understand, Your Honor.  And I did

11   want the Court to understand -- we didn't file a written

12   reply to the defendant's response, but I wanted the Court to

13   understand that we, we -- I hope, again, Your Honor, it goes

14   without saying that we don't necessarily adopt the view that

15   the defense has taken with respect to this motion.

16        Now, on our view -- on the United States' view on the

17   motion itself, Your Honor, I will tell the Court this

18   morning that regardless of how the Court rules, the United

19   States doesn't intend to make statements to the press about

20   this case.  That's a position that we've decided to take in

21   light of the concerns that have been raised by the Court

22   regardless, as I said, of the outcome of this motion.  And

23   perhaps the defense will wish to join us in that position.

24   Perhaps they won't.  I don't know.

25        Given that decision on the United States' part, Your

1    Honor, which resolves, as a practical matter, the impact of

2    the news media motion as it pertains most directly to us,

3    we're not going to discuss this matter in the media no

4    matter what the Court rules, then the United States is not

5    taking a position on the remainder of the motion.

6         We recognize certainly the Court's concerns and the

7    concerns that are raised by the news media, but we have

8    confidence in the Court's sound exercise of its discretion

9    of the balance of those interests.

10             THE COURT:  All right.  I just wanted to know if

11   there is a position.  Thank you, Mr. Ruby.

12        Is there a position by the defense on the motion that's

13   on the floor?

14             MR. BROWN:  Yes, Your Honor.  Blair Brown on

15   behalf of Mr. Blankenship.

16        We support the objective of the Court's order which is

17   to obtain a fair and impartial jury in this case.  I

18   understand by your question that you would like to hear from

19   us our bottom line position on this motion.

20             THE COURT:  No, I don't want to hear your bottom

21   line position.  I'm not asking you to take one.  I'm simply

22   asking if there is one, and I'll give you an opportunity to

23   present it if there is.  But I am not forcing anyone to take

24   a position.

25             MR. BROWN:  No, I understand.  I did not want to

25

1  suggest that, Your Honor.  I'm just trying to respond to, to

2  the questions you posed to the Government.

3      We -- I'd like to state our position so the Court knows

4  what it is and then explain why we have that position.

5      Our position is as long as the case is venued here, we

6  support the Court's order.  We support the objective of the

7  Court's order which is to obtain a fair and impartial jury.

8      But, however, due to the publicity in the case, due to

9  the emotion of this case, we believe that that goal, that

10 objective of a fair and impartial jury is not attainable

11 here.

12     We're not -- we have not filed a motion to change

13 venue.  We will file a motion to change venue which will be

14 supported.  And we will ask the Court at the appropriate

15 time after hearing from us and hearing from the Government

16 to, to change the venue.

17         THE COURT:  I think I understand that you support

18 the order as long as venue is here within the Southern

19 District of West Virginia.  Is that an accurate summary of

20 your position?

21         MR. BROWN:  It is, Your Honor.

22         THE COURT:  All right.

23         MR. BROWN:  And if I could just briefly explain

24 our position.  Our position --

25         THE COURT:  I don't want to hear or get into a

1    change of venue motion or discussion here today.  But with

2    that said, I'm happy to hear your reasoning.

3              MR. BROWN:  Thank you, Your Honor.

4         Before, before the Court -- and I believe this is

5    important to the Court's decision on this particular motion.

6    But before the Court had issued its order but after the

7    indictment had been filed, the Government widely

8    disseminated the indictment.

9         Before the Court issued its order, elected officials

10   from the entire State of West Virginia made inflammatory

11   comments about the indictment and Mr. Blankenship.

12        Before the Court issued its order, there had been years

13   of negative publicity, negative opinions that were

14   broadcast, printed, blogged in every form of communication

15   regarding Mr. Blankenship.

16        And, of course, there is the tragedy of the Upper Big

17   Branch mine blast that we believe has affected the jury pool

18   to such an extent that obtaining a fair and impartial jury

19   here is impossible.

20        We all know from trying cases that jurors claim they

21   will be impartial.  And jurors, many of them, actually want

22   to be impartial.  But we believe -- and we will set forth

23   this in far greater detail in our motion to change venue --

24   that it is impossible because of the emotion, because of the

25   publicity, because of the history here to have a fair and

```
 1    impartial set of jurors decide Mr. Blankenship's guilt or
 2    non-guilt in this case.
 3              THE COURT:  If I understand your position on the
 4    gag order further, with that statement you're saying that
 5    there is no step that this Court can take at this point
 6    that's going to ensure a fair and impartial jury on behalf
 7    of your client.
 8              MR. BROWN:  Other than transferring venue, that is
 9    correct.  So, --
10              THE COURT:  All right.
11              MR. BROWN:  -- unless and until the Court
12    transfers venue, we support the order in its current form.
13              THE COURT:  Thank you.
14              MR. BROWN:  Thank you.
15              THE COURT:  Mr. McGinley, I will get you a ruling
16    on your motion and I will try to do that quickly without --
17    I want to give some consideration further to your written
18    submission as well as your points that you made here today.
19         Without doing that, however, without additional
20    thought, there are, I believe when I look at the docket
21    sheet, some matters that are probably not available to view
22    that don't necessarily fall within the purview of the
23    language of the order of November the 14th.  And, so, I will
24    look at those issues and address that as well.
25              MR. MCGINLEY:  Judge, I wasn't served with a copy
```

1   of the defendant's response.  And, so, this is the first

2   time I've heard their argument.  If I could just have two

3   minutes, I think the Court probably knows what I'm going to

4   say, but I'll go back to the response, again, deals with the

5   pre-trial publicity.

6            THE COURT:  Uh-huh.

7            MR. MCGINLEY:  I don't think that there is a

8   showing here or even an argument that the gag and sealing

9   order, or either part of it, would be effective to prevent

10  jury bias.  The argument is all directed towards the

11  pre-trial publicity.

12       My understanding is not that the press received the

13  indictment from the Government, as was just suggested, but

14  was actually put on the docket and was available for a

15  period of time.  And that's how -- and, frankly, I think the

16  indictment should be available to the press.  That, that is,

17  you know, that's not something that I think is, is, should

18  be even a question.

19       But, again, I don't think that that meets the standard

20  that is required to impose a gag and sealing order.  And

21  that would be my only response.

22            THE COURT:  All right.  I understand that you and

23  Mr. Brown agree on certain issues and depart thereafter.  I

24  think I understand both of your positions.

25       You all have a good day.  I'll get you a ruling on your

```
 1   motion and I will try to do it relatively quickly.  With the

 2   holiday approaching, Mr. McGinley, I will try not to keep

 3   you waiting too long.

 4          MR. MCGINLEY:  Thank you, Your Honor.  I

 5   appreciate that.

 6          THE COURT:  Thank you.

 7      And I will move next to the defendant's motion that is

 8   also scheduled for hearing here to waive the Speedy Trial

 9   Act, counsel.

10      And, Mr. McGinley, if you want to leave counsel table,

11   you're welcome to do so.

12          MR. MCGINLEY:  Thank you, Your Honor.

13          THE COURT:  Yes, sir.  Have a good day.

14      Counsel.

15          MR. TAYLOR:  May it please the Court, my name is

16   Bill Taylor.

17          THE COURT:  Mr. Taylor.

18          MR. TAYLOR:  We greatly appreciate the privilege

19   of being before you this morning in this lovely courtroom.

20      As you know, when Mr. Blankenship made his initial

21   appearance, a schedule was set by the magistrate which

22   required motions to be filed by the end of December and set

23   a trial date at the end of January.

24      Our request is for relief from that schedule and for

25   the Court to set a reasonable schedule for the filing and
```

1   hearing on motions and the trial.

2        I'm prepared to discuss in some detail what that

3   involves from our point of view, as we have suggested, a

4   longer period of time than is permissible under the rules

5   but which the Court can, but which the Court can, of course,

6   allow.

7        And I -- if the Court will indulge me, I did want to

8   observe that we have been this morning arguing about a

9   motion that hasn't yet been filed.  But --

10            THE COURT:  The Court's well aware of that, Mr.

11   Taylor.

12            MR. TAYLOR:  We are all aware that to provide Mr.

13   Blankenship a fair trial will require diligent efforts by

14   all of the parties to this case.  And we are also aware that

15   the Court has to balance important interests that Mr., that

16   counsel for the media has articulated which the Court has

17   responded to and which make it, make it difficult to, to

18   decide the issues which this case presents.

19        I'm not going to reargue the extent of the publicity

20   except to tell you that there's no one in this room who

21   doesn't understand that Mr. Blankenship's reputation in this

22   district and in this division is affected -- has been the

23   subject of controversy for more than 30 years as a

24   strikebreaker, as a controversial political contributor, as

25   a contrarian on political issues, and as an enemy of the

1    United Mine Workers.

2         There is -- so, to put this issue properly before the

3    Court, we have to do the necessary research, surveying, and

4    polling so that we're not just talking about our anecdotal

5    view about -- our guesswork about how intense the publicity

6    has been and how deep it has affected the opinions of the

7    citizens of this division.

8         We are obliged under the case law and as responsible

9    advocates to put to the Court a reasonably scientific

10   demonstration that the publicity is per se, per se

11   prejudicial and so intense that *voir dire* will not be an

12   adequate remedy.

13        We're not suggesting that the Court should decide that

14   issue today one way or the other.  I think we rather prefer

15   that you -- that we -- that no one make any pre-judgments

16   about it, including the Government.

17        But in order for us to do that, we need time.  We, we

18   don't exaggerate.  We're not exaggerating the need for our,

19   for us to put this motion together.  That's why we've asked

20   for February the 20th.

21        In addition, Your Honor, we have a, a large number of,

22   of attacks on the sufficiency of this indictment which is,

23   in a word, aggressive and imaginative.  This is a very

24   unusual case, a very unusual set of charges in which a man

25   is accused of a willful conspiracy to commit mine safety

 1    violations in a mine where he never has been present.

 2                THE COURT:  Mr. Taylor, you're anticipating

 3    motions to dismiss?

 4                MR. TAYLOR:  Yes.

 5                THE COURT:  You're anticipating a motion for a

 6    change of venue?

 7                MR. TAYLOR:  Yes.

 8                THE COURT:  What efforts have been made towards

 9    the filing of those motions given the existing trial date?

10                MR. TAYLOR:  As hard as we can go.

11                THE COURT:  And with respect to the motion for a

12    change of venue that you indicated just a moment ago about

13    the information that would be necessary to put before the

14    Court, what efforts have been initiated to get that in a

15    posture to present the actual motion?

16                MR. TAYLOR:  We have, we have obtained -- we've

17    retained the necessary consultants and polling experts.

18    They have not been able to begin, but they are about to

19    begin that process.  But, you know, you have to not only get

20    the polling, but you also have to accumulate the press.

21                THE COURT:  I understand.

22                MR. TAYLOR:  We have to put before the Court the

23    nature of the press as well as its impact.  And the polling

24    just shows you the impact.

25                THE COURT:  You intend to file a motion for change

 1    of venue.  You intend to file motions -- and I say motions

 2    given your statement -- to dismiss.  Other pre-trial motions

 3    you're anticipating that in your position and from your

 4    perspective necessitates any type of delay plea, the

 5    motions?

 6              MR. TAYLOR:  I'm sorry?

 7              THE COURT:  Any other motions that you intend to

 8    make pre-trial that in your opinion and from your

 9    perspective necessitates a delay of the trial date?  Are

10    there others?

11              MR. TAYLOR:  Well, I'm just talking about the

12    motions date I guess, I guess if you grant our relief in

13    connection with the motions deadline.

14         But, Your Honor, 60 days to trial and 30 days to file

15    these motions is unreasonable in any, under any scenario.

16    We can't possibly be ready to try this case by the end of

17    January.  We can't -- we can't put these motions together by

18    the end of December.

19         We have 15 to 20 honest to goodness direct attacks on

20    this indictment which should succeed, nevermind the fact

21    that, you know, you have two conspiracies.  One is lopped

22    into the other.  You have public statements which are

23    attributed to Mr. Blankenship, although he didn't author

24    them and although they are the vaguest possible --

25              THE COURT:  Without the editorial, Mr. Taylor, are

1   there other motions that from your perspective need to be

2   filed that would necessitate the Court granting you the

3   delay that you're asking for?

4           MR. TAYLOR:  Yes.

5           THE COURT:  There will be a day that I will listen

6   to or read, at the very least, the comments with respect to

7   the adjectives that are being used.

8           MR. TAYLOR:  Yes.

9           THE COURT:  But I simply want to know today in

10  terms of substance what else, in your opinion, needs to be

11  done that would necessitate the delay that you're

12  requesting?

13          MR. TAYLOR:  Well, first of all, we need the time

14  to file the motions.  I suspect the Government is going to

15  ask for time in excess of that which is granted by the

16  rules, and they will need it.  And, so, a timetable of the

17  sort which now exists is simply impossible.

18      Now, in terms of a trial date, we're prepared to

19  discuss what's necessary for us to be ready for trial.  That

20  is a much more complicated story, Your Honor.  We, we need a

21  year to prepare to defend this case.

22      Now, a year sounds like a long time.  But the

23  Government's had four and a half years to bring this

24  indictment.  They have provided us most recently in

25  electronic form with documents which total almost

1   four million pages.  And that's not all.  I would like to

2   actually hand to the Court the itemization of the discovery

3   which is available if I may.

4           THE COURT:  Yes, sir.

5           MR. TAYLOR:  Most of it refers to Bates numbers.

6       Mr. Ruby, this is, this is the --

7       So, I'm sure you'll want to keep it under seal.  But

8   this is the list which we have been provided thus far --

9           THE COURT:  Thank you.

10          MR. TAYLOR:  -- of materials.

11          THE COURT:  I have -- and I should have stated

12  this to you earlier, Mr. Taylor, in all fairness, reviewed

13  your motion to -- and I will say to waive the client's

14  rights under the Speedy Trial Act.  I've reviewed all of

15  that, the response, the reply such that I'm aware of those

16  arguments.

17      I believe that any delay in the deadline for filing

18  motions will obviously necessitate a delay in the actual

19  trial date which is why I wanted you to be able to place on

20  the record any motions that you intend to file that you

21  believe requires a delay.

22      You have indicated various motions to dismiss, a motion

23  to change venue.  Are there others?

24          MR. TAYLOR:  There are numerous motions to

25  dismiss.  There's a motion for a bill of particulars,

1    motions for -- motions to strike allegations in the

2    indictment, motions that, that address imperfections in the

3    indictment.  They are all meritorious and they're all

4    substantial.  There are 15 to 20 in number.

5         And, frankly, as a matter of, of work load -- we've

6    only been in this case for a month.  We are, we are playing

7    catch-up.  I'm not telling you that we don't know anything

8    about this case, but we didn't have the kind of interaction

9    with the United States Attorney's Office which you often

10   have before an indictment is brought so that we had some

11   anticipation of what we would be, were being asked to do.

12        So, we need a, a period of the sort that I have asked

13   for the filing of those motions and for the Government to

14   respond to them.  And, frankly, then for the Court to hear

15   argument or to decide them.

16        And that's going to take us, in my professional

17   judgment, Your Honor, -- and I'm not here to exaggerate or

18   impose upon the Court or seek delay for its own sake, but

19   simply to -- it will take us into February to get done what

20   needs to be done on the transfer motion, that is, dealing

21   with the outside issues of that, and the preparation and

22   filing of responsible motions that the Court will, I think,

23   grant.

24        But if the Court is interested in discussing beyond

25   that a reasonable date for trial, I'm not urging that you do

1    that.  One approach would be to see where we are at the end

2    of, at the end of motions.  But it would -- if we're going

3    to talk about a reasonable date for trial, we've got a lot

4    of work to do.

5              THE COURT:  All right.  Thank you, Mr. Taylor.

6         Any response, counsel?  Mr. Ruby?

7              MR. RUBY:  Yes, Your Honor.  Thank you.

8         I'll just say at the outset -- and I'm not going to get

9    into the business of arguing motions that haven't been filed

10   yet and may or may not be filed.  I'll just note for the

11   record that, that the United States disagrees with the

12   various characterizations that, that have been made by

13   defense counsel of infirmities or problems in the

14   indictment.  I'll leave it at that.  We can discuss the

15   substance of those if and when those motions are filed later

16   on.

17        With respect to the, the specific request that the

18   defense has made to continue the, the motions deadline until

19   sometime in late February, I haven't heard anything, Your

20   Honor, from defense counsel that leads me to believe that a

21   continuance of that magnitude is necessary.

22        The United States is -- we're not trying to be

23   unreasonable, Your Honor.  We are -- we'll represent that we

24   will not oppose a brief, and I'll emphasize brief,

25   continuance of the motions deadline which is currently set

1   for, I believe, 13 days from now because -- in part because

2   the defense has represented that they intend to take a poll.

3       I don't see why it should require two months to -- and

4   that's the major source of delay.  I don't see why it should

5   take two months to take a poll, to collect newspaper

6   articles that have been written in connection with this case

7   and put those together in a form that the Court can consider

8   in a motion, particularly since, as Mr. Taylor's

9   represented, the defense has already been diligently working

10  at those tasks for the month since the indictment.

11      And, so, on that particular issue, the timing of the

12  motions hearing, to summarize, Your Honor, the United States

13  could, could see its way clear to, to a brief continuance,

14  but not the sort of continuance until late February that the

15  defense is requesting.

16      As to the timing of trial -- and I don't know if the

17  Court wants to -- well, I believe, as the Court indicated,

18  if there is going to be a change in the motions deadline, I

19  think it's going to necessitate a change in the trial date.

20      I don't believe, Your Honor, -- I know the defense

21  motion requested, at least pending a hearing, and maybe this

22  hearing resolved the request that they made, the defense

23  motion had requested an open-ended trial date.

24      I don't believe the Court can do that under the Speedy

25  Trial Act.  I believe that a date certain does need to be

1    set for trial.

2         I, I certainly don't believe -- the United States

3    certainly doesn't believe that it's going to take us a year,

4    or is going to take the defense a year to get ready to try

5    this case, Your Honor.

6         The -- and, and there's a discussion, of course, of the

7    documents that the defense, that the defense mentioned in

8    the United States' written response which I know that the

9    Court has read.  I'm going to talk about those if Your Honor

10   will indulge me just a bit.

11        After the explosion at UBB Massey and later Alpha,

12   which took control of Massey's operations, made a very broad

13   production of documents to the United States.  Most of those

14   documents are not documents that the United States would

15   have been required to produce in this case.  They're not

16   documents that we're going to use in our case-in-chief.

17   They're not *Brady*.  They're not *Giglio*.  They're not *Jencks*.

18        They are -- for example, Your Honor, a great many of

19   them are routine daily reports on performance statistics

20   that were kept at Massey's various mines and that were

21   e-mailed every day to a long list of officials at Massey.

22        Others are documents that were collected in connection

23   with investigations of other officials at Massey, officials

24   other than the defendant in cases that the Court, some of

25   which at least the Court is aware of.

1    The United States decided notwithstanding that to err

2    very far on the side of inclusiveness in its production

3    because we didn't want the defense to complain down the road

4    that we didn't turn over something that we should have.

5    But the indictment lays out with specificity the

6    allegations against the defendant.  And, as a result, the

7    defense ought to be able to quickly identify the documents

8    that, that aren't closely connected to those allegations and

9    move on from them.

10    Many of the key documents in addition, Your Honor, that

11    show the defendant's guilt have already been identified for

12    the defendant in grand jury materials that have been

13    produced.

14    I'd also point out that the defendant has a unique and

15    a tremendous advantage when it comes to both the documents

16    and the witnesses in this case, which is that no one knows

17    how things were done at Massey and who did them better than

18    the defendant does.

19    The bulk of the documents that the United States has

20    turned over to the defense are Massey documents, documents

21    that the defendant either personally handled or documents

22    that were generated in business processes that he's very

23    familiar with.

24    If there are documents that can show, for example,

25    that -- I won't go into specifics.  But if there are

1    documents out there that can refute the allegations that are

2    made in the indictment, then the defendant is in a very good

3    position to know where those are and how to find them.

4        It there are witnesses, similarly, who can refute the

5    allegations that are made in the indictment, then the

6    defendant who, who ran the company where these events took

7    place for many, many years will know where they -- who they

8    are and where to find them.

9        Your Honor, I would also point out -- and this is

10   something that we did not include.  I think there may have

11   been a reference in our written submission to the fact that

12   many of the documents are -- in the production are

13   duplicates.  We were able yesterday to get some more

14   specific information on that for the Court's benefit.

15       At least 90,000 of the documents that the United States

16   produced to the defense are duplicates of other documents in

17   the production.  Now, typically this happened where an

18   e-mail was sent to multiple recipients.  There were multiple

19   people on the "to" list or the "cc" list in the e-mail

20   within Massey.  And Massey or Alpha turned over multiple

21   copies to the United States of that same e-mail.

22       The United States produced all these documents to the

23   defense again so that we are not accused later on of holding

24   something back.  But defense counsel has access, just as the

25   Government does, to software that is able to identify these

1   duplicates and allow them to, to avoid reviewing these extra

2   copies.

3        On that note, Your Honor, I'd also point out that the

4   defendant has access to, to virtually unlimited resources to

5   review the materials that have been produced and to prepare

6   this case.

7        And he has -- and my, my compliments to Mr. Taylor and

8   his colleagues.  The defendant has hired one of the very

9   best law firms in the entire country to represent him with

10  dozens of superb lawyers and access to many more lawyers who

11  specialize in reviewing documents.

12       It's not uncommon for firms of the caliber of defense

13  counsel to use dozens of reviewers on large sets of

14  documents with high-tech software to help make it go faster

15  and to capably handle sets of documents that are

16  significantly larger than the one that's involved here.

17       Finally, Your Honor, I'd note that -- and this is

18  pointed out in our written submission as well.  I'd note --

19  and I know the Court is well aware of this.  The public also

20  has an interest in a speedy trial here.

21       The public has a well-established interest in prompt

22  proceedings in criminal cases for a variety of reasons,

23  including the need to deter criminal conduct by others.

24       I'd ask the Court to be vigilant against -- as this

25  proceeding goes along to be vigilant against requests for

1    delay for the sake of delay or just to make things easy for

2    the lawyers.

3         Delay would, to some extent, make life easier for all

4    the counsel in this case.  And that's true in just about any

5    case, including counsel for the United States.  But our

6    comfort is not a reason to deny the public its right to

7    proceedings that are as prompt as possible.

8              THE COURT:  Anything further?

9              MR. RUBY:  No, Your Honor.

10             THE COURT:  Mr. Taylor, is there anything you want

11   to offer in addition before we close?

12             MR. TAYLOR:  Yes, Your Honor.

13        We've been talking this morning about a fair trial.

14   There are at least two important elements to that.  One is

15   the ability to select a fair and impartial jury, and the

16   other is to have the effective assistance of counsel.

17        This indictment, as much as my colleagues would like to

18   describe it as simple and straightforward, is not.  It, for

19   example, accuses Mr. Blankenship of a conspiracy willfully

20   to commit violations of the Mine Safety Act, 850 of them in

21   number.

22        Now, you and I know, as does Mr. Ruby, that mine safety

23   violations come in all forms.  Some are inadvertent.  Some

24   are minor.  Some are more serious.  And some are, are

25   completely in spite of everybody's efforts.

1    We've got to look at every one of those.  We have to

2    defend Mr. Blankenship from the allegation that he conspired

3    willfully to commit mine safety violations which are alleged

4    in this indictment to number in the hundreds.  We have to

5    defend him against that allegation by looking at those

6    violations themselves.

7    And there must be hundreds of witnesses.  The case

8    agent testified that he interviewed over 100 witnesses.

9    They got production from 23 sources.  We've got 23 immunity

10   agreements, Your Honor.

11   This is -- it may be just 43 pages, but by the time you

12   get to:  What are these -- what do these citations, safety

13   citations involve?  Is the cause of them -- what's the cause

14   of them?  The indictment says production and budgeting

15   decisions.  Well, who's responsible for the budgeting

16   decisions?  What is this company's attitude toward safety?

17   This is an accusation that Mr. Blankenship and the

18   company put production over safety, which is not true.  But

19   we can't defend these allegations without taking the time

20   to -- and finding these witnesses.  Mr. Blankenship does not

21   run this company and hasn't since 2010.  He has no

22   particular access to, to witnesses.  And he is prohibited,

23   as you know, from speaking to witnesses.

24   So, delay is a word that is used when people are trying

25   to find some reason to stave off the inevitable.  What we're

1    telling you is the effective role -- our effective

2    assistance to Mr. Blankenship requires that we do a lot of

3    work, that we interview witnesses, that we determine what

4    these violations consist of, whether there is a causal

5    relationship, whether, whether experts agree.  And we can't

6    do that on this, this kind of timetable.  Nobody could.

7        So, with all due respect, Your Honor, I do not, I do

8    not exaggerate the difficulty that we have or the need for

9    constitutionally effective defense in this case for us to

10   have time to prepare.

11       THE COURT:  All right, gentlemen, I'll give

12   consideration to your arguments and I will enter a written

13   order.

14       However, I am going to, Mr. Taylor, grant your motion

15   to the extent that I am going to extend the deadline for the

16   filing of motions, finding good cause has been stated.  I

17   will give consideration to both of your arguments and enter

18   a written order with a new deadline in it.  You all have a

19   good day.

20       MR. RUBY:  Thank you, Your Honor.

21       (Proceedings concluded at 11:02 a.m.)

22

23

24

25

1         I, Lisa A. Cook, Official Reporter of the United

2   States District Court for the Southern District of West

3   Virginia, do hereby certify that the foregoing is a true and

4   correct transcript, to the best of my ability, from the

5   record of proceedings in the above-entitled matter.

6

7

8         s\Lisa A. Cook                    January 6, 2015

9            Reporter                          Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25