IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                                Criminal Action No.: 5:14-cr-00244
                                                (Hon. Irene Berger, District Judge)

DONALD L. BLANKENSHIP,

    Defendant.

**EMERGENCY MOTION AND MEMORANDUM IN SUPPORT OF MOTION OF CERTAIN VICTIMS, THE FAMILY MEMBERS OF CERTAIN VICTIMS OF THE UPPER BIG BRANCH MINE EXPLOSION, AND THE WEST VIRGINIA ASSOCIATION FOR JUSTICE TO INTERVENE FOR THE LIMITED PURPOSE OF MOVING THE COURT TO LIMIT THE SCOPE OF ITS JANUARY 7, 2015, GAG ORDER**

      Certain victims and family members of victims of the Upper Big Branch Mine explosion and the West Virginia Association for Justice ("WVAJ"), pursuant to the First Amendment of the United States Constitution, the common law and other well-recognized legal grounds, hereby move this Court to restrict or otherwise limit the application of its previously issued January 7, 2015, Amended Order, Doc. 64, which gagged the "actual and alleged victims . . . [and] family members of actual and alleged victims" from making "any statement of any nature, in any form . . . regarding the facts or substance of this case." Doc. 64.

      By way of brief background, on December 1, 2014, a *Motion of the Wall Street Journal, the Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc., to Intervene for the Limited Purpose of Moving the Court to Reconsider and Vacate the November 14, 2014, Gag and Sealing Order* ("Wall Street Journal Motion"), Doc. 30, was filed in this action, along with a supporting memorandum, Doc. 31. Upon due consideration of the briefing on said motion, on January 7, 2015, this Court entered a

*Memorandum Opinion and Order* granting in part and denying in part the Wall Street Journal Motion. Importantly, this Court's Amended Order of January 7, 2015, left the gag order in place. Doc. 64. The instant interveners include actual victims Stanley Stewart and Charles Williams, and the family members of certain victims of the Upper Big Branch disaster, including administrators and/or executors of the following estates: Estate of Joe Marcum; Estate of Adam Morgan; Estate of Michael Elswick; Estate of Jason Atkins; Estate of Kenneth Chapman; Estate of William R. Lynch; Estate of Howard Payne, Jr.; Estate of Carl Accord; Estate of Nicolas McCroskey; Estate of Ricky L. Workman; Estate of Ronald Maynor; Estate of James K. Woods; Estate of Deward Scott; and Estate of Howard Persinger.

The interveners also include the WVAJ. The WVAJ is a private non-profit organization consisting of attorneys licensed in the State of West Virginia who represent those persons and entities harmed by the wrongful conduct of others. The WVAJ and its members are particularly interested in securing the rights of ordinary individuals to redress in the Courts of this State as provided by the West Virginia Constitution, the West Virginia Code, and the decisions of the courts. As part of its mission, WVAJ monitors the legislative process and, through its members and seeks to assist the Legislature in assuring that the civil justice system remains available to persons and entities harmed by wrongful conduct. WVAJ members and their clients regularly make presentations to individual members and legislative committees. WVAJ members represented interveners and the majority of the victims of the Upper Big Branch Mine Explosion and seek to assist the other interveners and other victims now subject to the Court's order to petition the Legislature regarding potential changes in West Virginia Law.

West Virginia law currently permits an employee or his or her estate's executor or administrator to prosecute a civil action and recover damages from an employer when the

2

employer's deliberate intention resulted in a serious injury or death to the employee. W.Va. Code § 23-4-2. This cause of action, commonly known as a claim for "deliberate intent" has been targeted by representatives of the State's employers for modification or elimination. *See* Exhibit A. (Legal reform proposals from West Virginia Chamber of Commerce).

The West Virginia Legislature convened for its 2015 regular session on January 14, 2015. http://www.legis.state.wv.us/Bulletin_Board/calendar_2015.cfm. The regular session ends at midnight March 14, 2015. *Id.* A number of bills have been introduced in the current legislative session which, if adopted in their current form, will radically curtail the availability of a deliberate intent claim. *See* S.B. 11 (Exhibit B); S.B. 251 (Exhibit C); H.B 2011 (Exhibit D). The bills are actively being considered by the Legislature. Yesterday, **the House Judiciary Committee held a hearing on H.B. 2011 and will likely run the bill tomorrow.** *See* http://www.legis.state.wv.us/committees/house/house_com_agendas.cfm?Chart=jud&input=Wednesday,%20January%2021,%202015 (Exhibit E). Interveners, all of whom oppose these changes, seek to appear before the House Judiciary Committee and petition the body to reject the proposed bill. Some interveners have received inquiries from West Virginia legislators to present their experiences during and following the UBB explosion.

Interveners oppose the changes in the deliberate intent claim because they believe that these same laws operate to deter unsafe acts by businesses and set community standards for what is appropriate business conduct. These laws keep West Virginia workers safe. Interveners, through their experiences on and after April 5, 2010, have unique perspectives on the need for stronger, not weaker, employee safety laws.

Under the current order of this Court, the halls of the state Capitol will be silent as to the occurrence on April 5, 2010. Elected legislators will not hear from actual victims of illegal and

unsafe working conditions about the need for legal remedies to protect workers, like the 29 miners who perished underground at the UBB mine on April 5, 2010. The UBB explosion was a forever, life-altering event for the interveners and numerous communities throughout Southern West Virginia. To forbid victims and families of the victims (who are victims themselves) from speaking and participating in government is a breach of the social contract and unconscionable under the First Amendment. As such, the interveners move that this Court limit the application of the gag order to permit these persons to exercise their fundamental constitutional right to petition their government and participate in the democratic process.

The interveners have standing to bring the instant motion because the conduct complained of has caused continues to cause an 'injury in fact' that a favorable judgment will redress. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12, 124 S.Ct. 2301 (2004) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130 (1992)). This is to say that the interveners are being denied their first amendment right by operation of the subject order. "[E]ven a short-lived 'gag' order in a case of widespread concern to the community constitutes a substantial prior restraint and causes irreparable injury to First Amendment interests as long as it remains in effect." *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1304, 103 S. Ct. 3524, 3526 (1983). Similar to the interveners in the Wall Street Journal Motion, this Court should exercise "its discretion in favor of granting intervention for the limited purpose of entertaining the Movants' substantive argument(s)." Doc. 63 at 4.

I.  **The interveners have a first amendment right to speak on matters of public concern and to petition their government.**

The First Amendment provides that Congress "shall make no law ... abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." "[T]here is practically universal agreement that a major

4

purpose of that [the First] Amendment was to protect the free discussion of governmental affairs. This, of course, includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. State of Ala.*, 384 U.S. 214, 218-19, 86 S. Ct. 1434, 1437 (1966). The First Amendment includes the intertwined right to engage in political speech and the right to petition government for redress of grievances. *See* U.S. Const. Amend. 1.

"The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill v. State of Alabama*, 310 U.S. 88, 101-102, 60 S.Ct. 736, 744 (1940)(citations omitted). This right to speak on matters of public concern is further complemented by the interconnected right of citizens to petition their government. In *McDonald v. Smith*, 472 U.S. 479, 486-87, 105 S. Ct. 2787, 2791-92 (1985), our Court recognized that:

> "[T]he right to petition the Government requires stringent protection. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States v. Cruikshank*, 2 Otto 542, 92 U.S. 542, 552, 23 L.Ed. 588 (1876). The right to petition is "among the most precious of the liberties guaranteed by the Bill of Rights," *Mine Workers v. Illinois Bar Assn.*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967), and except in the most extreme circumstances citizens cannot be punished for exercising this right "without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions," *De Jonge v. Oregon*, 299 U.S. 353, 364, 57 S.Ct. 255, 260, 81 L.Ed. 278 (1937). . . . The First Amendment requires that we extend substantial " 'breathing space' to such expression, because a rule imposing liability whenever a statement was accidently or negligently incorrect would intolerably chill "would-be critics of official conduct ... from voicing their criticism." 376 U.S., at 272, 279, 84 S.Ct., at 721, 725.

Accordingly, the interveners' constitutional interest in speaking with their representatives goes to the very nucleus of our representative government and the First Amendment jurisprudence.[1]

The First Amendment's Right to Petition was central to constitutional law and politics in the early United States. It is the First Amendment's capstone: "Congress shall make no law ... abridging ... the right of the people ...to petition the Government for a redress of grievances." The Right to Petition should not be considered to be merely an extension of the first four rights protected in the First Amendment; rather as an explicit right, it stands on its own. As Chief Justice John Marshall, noted: "[N]o clause in the Constitution is intended to be without effect..." *Marbury v. Madison*, 5 U.S. 137,174(1803).

The Petition Clause has its own distinct history and English roots different than other First Amendment provisions. The Petition Clause finds its roots in Article 61 of the Magna Carta (1215). Article 61 provided for the presentation of grievances to the king, and required the king to redress grievances within 40 days or risk rebellion. The Magna Carta's Right to Petition includes, if the right is abridged, the right to wage whatever war against government needed to get just redress. See *http://www.iamm.com/magnaarticles.htm#61*.

The English Bill of Rights of 1689 gave petitioning a special place by protecting petitions from prosecutions: "That it is the right of the subjects to petition the king, and all commitments and prosecutions for such petitioning are illegal." *See* http://avalon.law.yale.edu/17th_century/england.asp.

---

[1]Though not directly at issue, the West Virginia Constitution provides similar rights. *See also* W. Va. Const. Art. III § 16 (provides that "[t]he right of the people to assemble in a peaceable manner, to consult for the common good, to instruct their representatives, or to apply for redress of grievances, shall be held inviolate"); W. Va. Const. Art. III § 10 (recognizing the right to freedom of speech under West Virginia's Constitution).

Petitioning was also an integral part of colonial politics. Colonial assemblies entertained many types of grievances. Indeed, the Declaration of Independence lists 27 grievances against King George and "others". *See* http://www.shestokas.com/declaration-of-independence/. The Declaration details the colonists' petitions and the King's response: "In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury."

The Magna Carta outlined the response when Petitions for Redress were ignored: Rebellion. The Right to Rebellion defined in 1215 in the Magna Carta was exercised in 1776 and explained in the Declaration. *Id.* This was the history of America as the First Amendment was drafted. Thus, in balancing the rights here, this Court should consider the fact that it is dealing with a right so ingrained that its violation was considered by the authors of the Constitution to justify rebellion.

## II. The January 7, 2015, gag order is a prior restraint that is presumptively unconstitutional and demands strict scrutiny.

A prior restraint upon speech carries with it a "heavy presumption against its constitutional validity." *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1305, 103 S. Ct. 3524, 3526 (1983)(citation omitted). Any such limitations placed upon speech before it occurs carries with it the necessity that the restrain serve a "compelling governmental interest" that is "narrowly tailored to serve that interest." *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1305-06, 103 S. Ct. 3524, 3526 (citation omitted). Further, the Court's gag order is a content-based restriction that demands application of strict scrutiny requiring the "least restrictive means" of furthering a "compelling governmental interest." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, 120 S. Ct. 1878, 1886 (2000).

It has been said that a prior restraint order must show a "clear and present danger" that the pretrial publicity will adversely affect a defendant's right to a fair trial. *Central South Carolina Chapter, Society of Professional Journalists, Sigma Delta Chi v. United States District Court for the District of South Carolina*, 551 F.2d 559, 562 n. 3 (4th Cir. 1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749 (1978). It is through this heightened examination and heavy presumption of unconstitutionality that the Court's Amended Order must be examined.

### III. The subject order is vague, overbroad and not narrowly tailored to serve a compelling governmental interest.

Court's "assume that [a hu]man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298-99 (1972)(citations omitted). Where an order restricts constitutionally protected conduct and/or speech, the specificity of such an order must be narrowly tailored and strictly construed. This Court's order leaves undefined the term "family members of actual and alleged victims" and the precise parameters of the "facts or substance of this case." Doc. 64.

It remains unclear of the level of consanguinity that applies to the term "family." May cousins, aunts and uncles speak on matters of public concern? The Court merely indicates that it applies "only to those who may appear during some stage of the proceeding or as parties or as witnesses." *Id.* at 6. Such a broad definition, without knowing who may be called as a witness by the United States or defendant Blankenship, limits participation in government which would otherwise be permitted.

In *In re Russell*, 726 F.2d 1007 (4th Cir. 1984), the court held that a gag order limiting potential witnesses from discussing their proposed trial testimony was not vague and overbroad.

8

*Id.* at 1011. In *Russell*, the court's order defined "potential witness" as "a person who has been notified by the government or by defendants that he or she may be called to testify in this case, or any person who has actually testified in this case." *Id.* at 1008. Moreover, the *Russell* court expressly defined the nature of the prohibited speech and, even then, did not outright prohibit statements that were not intended to be disseminated "by means of public communication." *Id.* This Court's Amended Order fails to define exactly who is prohibited from speaking and precisely what they are prohibited from speaking about.

For the same reasons, the Amended Order is overbroad insofar as it prohibits constitutionally protected conduct related to the victims and the victims' families participating in their government. An order is overbroad where it sweeps too broadly so as to indiscriminately reach into both protected and unprotected activities. *See United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 1838 (2008). The constitutionally protected conduct, contact with governmental representatives regarding a potential change in law, is directly at issue and not a mere hypothetical proposition. Interveners are in a catch-22. They desire to exercise their right to participate in government, nevertheless, precisely who may participate and the manner in which they may participate is not narrowly defined or tailored so as to permit them to exercise their right.

IV. **The interveners'' interests in participating in their government is paramount under the facts presented.**

Without a doubt, this Court has an obligation to maintain the integrity of the judicial process and ensure all who are charged with a crime receive a fair day in Court.[2] Nevertheless, as

---

[2] One commentator has suggested that the basic assumption that gag orders make a positive difference in seating a jury has not been proven. Erwin Chemerinsky, *Lawyers Have Free Speech Rights, Too: Why Gag Orders on Trial Participants Are Almost Always Unconstitutional*, 17 Loy. L.A. Ent. L.J. 311, 312 (1997). As such, under scenarios like the one presented, a court is weighing an assumptive prejudice versus a direct impediment to the interveners' first amendment right. The Court's limitation upon the interveners' First Amendment right has diminishing returns. The

this Court has recognized, when faced with First and Sixth amendment issues, balancing must occur to protect such interests. *See* Doc. 63 at 5. To restrict speech, there must be an imminent threat to a fair trial or other constitutional interests. *CBS, Inc., v. Young*, 522 F.2d 234, 238 (6th Cir. 1975). There must be a "reasonable likelihood" of prejudicing a fair trial. *In re Russell*, 726 F.2d 1007, 1010. "In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases. Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." *Pennekamp v. State of Fla.*, 328 U.S. 331, 347, 66 S. Ct. 1029, 1037 (1946).

An integral part of United States citizenship is the ability to participate in our democratic process. This bedrock principle is borne out of the First Amendment. Indeed, political speech is the primary object of First Amendment protection. *See e.g., Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434 (1966). This Court's Amended Order, Doc. 64, has a chilling effect upon the very speech that the First Amendment is designed to protect. The interveners seek to petition their government and instruct their representatives. Inextricably intertwined with their ability to exercise their right, are their individual stories of how the Upper Big Branch disaster affects their life and the need for continuing laws to protect workers and compensate victims for their harms and losses. Recognizing the interests at stake, the most reasonable alternative is to amend the gag order so as to permit the victims and their families to participate in government. The first day of

---

reliability of the assumption that a gag equates to a fair trial tends to wane where media, consistent with the Court' Amended Order, continues to report upon the instant matter. *See e.g.*: http://www.timesleaderonline.com/page/content.detail/id/770172/Judge-keeps-most-of-gag-order-in-former-W-Va--coal-exec-case.html?isap=1&nav=5020.

the 2015 West Virginia Legislative session was January 14, 2015. *See* W.Va. Const. Art. VI Sect. 18.

WHEREFORE, for the foregoing reasons, the interveners, Certain Upper Big Branch Victims and the Family Members of Certain Upper Big Branch Victims and the West Virginia Association for Justice, by counsel, hereby request this Court to enter an appropriate order granting their motion to intervene and to reconsider and vacate the January 7, 2015, gag order.

CERTAIN VICTIMS AND THE
FAMILY MEMBERS OF
CERTAIN VICTIMS OF THE UPPER
BIG BRANCH MINE EXPLOSION AND
THE WEST VIRGINIA ASSOCIATION
FOR JUSTICE,
By Counsel,

s/ Timothy C. Bailey
Timothy C. Bailey, Esquire (WVSB #5839)
Mark A. Barney, Esquire (WVSB #10282)
BUCCI, BAILEY & JAVINS, L.C.
P.O. Box 3712
Charleston, WV 25337
(304) 345-0346

and

Scott S. Segal, Esquire (WVSB # 4717)
Samuel A. Hrko, Esquire (WVSB #7727)
The Segal Law Firm
810 Kanawha Blvd. E
Charleston, WV 25301
(304) 344-9100
*Counsel for Tammy Morgan as Administratrix of the Estate of Adam K. Morgan, Kathy Marcum as Administratrix of the Estate of Joe Marcum and Stanley Stewart and Mindi Stewart*

Robert A. Campbell, Esquire (WVSB # 6052)
Stephen B. Farmer, Esquire (WVSB # 1165)
Farmer, Cline & Campbell, PLLC
P.O. Box 3842
Charleston, WV 25338
304-346-5980
*Counsel for Erica Payne Stanley as Administratrix of the Estate of Howard D. Payne, Jr.*

s/Anthony J. Majestro
Anthony J. Majestro, Esq. (WVSB #5165)
POWELL & MAJESTRO, PLLC
405 Capitol Street, Suite P1200
Charleston, WV 25301
Phone: (304) 346-2889
Fax: (304-346-2895
*Counsel for West Virginia Assoc. for Justice*

11

J. Robert Rogers, Esquire (WVSB # 3153)
3972 Teays Valley Road
Hurricane, WV 25526-9796
Telephone: (304) 757-3809
Facsimile: (304) 757-2694
*Counsel for Heidi Persinger, as Administratrix of the Estate of Dillard E. Persinger and Crissie Scott, as Administratrix of the Deward E. Scott*


John D. Wooton, Esquire (WVSB #4138)
Christopher M. Davis, Esquire (WVSB #9050)
The Wooton Law Firm
P.O. Drawer 2600
Beckley, WV 25802
Telephone: (304) 255-2188
Facsimile: (304) 255-2189
*Counsel for Cody Acord as Administrator of the Estate of Carl Acord*

Wendle D. Cook Esquire (WVSB #812)
Cook & Cook
P.O. Box 190
Madison, WV 25130-0190
Telephone: (304) 369-0110
Facsimile: (304) 369-6800
*Counsel for Amanda Atkins as Administratrix of the Estate of Jason Atkins*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                      Criminal Action No.: 5:14-cr-00244
                                      (Hon. Irene Berger, District Judge)

DONALD L. BLANKENSHIP,

    Defendant.

## CERTIFICATE OF SERVICE

I, Anthony J. Majestro, hereby certify that I filed the foregoing **EMERGENCY MOTION AND MEMORANDUM IN SUPPORT OF MOTION OF CERTAIN VICTIMS, THE FAMILY MEMBERS OF CERTAIN VICTIMS OF THE UPPER BIG BRANCH MINE EXPLOSION, AND THE WEST VIRGINIA ASSOCIATION FOR JUSTICE TO INTERVENE FOR THE LIMITED PURPOSE OF MOVING THE COURT TO LIMIT THE SCOPE OF ITS JANUARY 7, 2015, GAG ORDER** with the Clerk of the Court by hand delivery this 22nd day of January, 2015, and counsel of record via USPS, postage pre-paid:

Alexander Macia, Esq.
Spilman Thomas & Battle
PO Box 273
Charleston, WV 25321
Phone: 304-340-3800
Fax:    304-340-3801
amacia@spilmanlaw.com
Counsel for Defendant Blankenship

James A. Walls, Esq.
Spilman Thomas & Battle
PO Box 615
Morgantown, WV 26507-0615
Phone: 304-291-7947
Fax:    304-291-7979
jwalls@spilmanlaw.com
Counsel for Defendant Blankenship

Blair Gerard Brown, Esq.
Eric R. Delinsky, Esq.
Richard Miles Clark, Esq.
Steven N. Herman, Esq.
William W. Taylor, III, Esq.
Zuckerman Spaeder
1880 M. Street, NW, Suite 1000
Washington, DC 20036
Phone: 202-778-1829
Fax:    202-822-8106
bbrown@zuckerman.com
edelinsky@zuckerman.com
mclark@zuckerman.com
sherman@zuckerman.com
wtaylor@zuckerman.com

John H. Tinney, Jr.
The Tinney Law Firm
PO Box 3752
Charleston, WV 25337-3752
Phone: 304-720-3310
Fax:    304-720-3315
jacktinney@tinneylawfirm.com
Counsel for Defendant Blankenship

| | |
|---|---|
| R. Booth Goodwin, II, Esq.<br>Steven R. Ruby, Esq.<br>U.S. Attorney's Office<br>PO Box 1713<br>Charleston, WV 25326-1713<br>Phone: 304-345-2200<br>Fax: 304-347-5104<br>usawvs.ecfusa@usdoj.com<br>steven.ruby@usdoj.gov | Sean P. McGinley, Esq.<br>DiTrapano Barrett DiPiero McGinley<br>   & Simmons, PLLC<br>604 Virginia Street, East<br>Charleston, WV 25301<br>Phone: 304-342-0133<br>Fax: 304-342-4605<br>Counsel for Intervener Press |

s/Anthony J. Majestro
**Anthony J. Majestro (WVSB 5165)**